*360 OPINION OF THE COURT
Edward J. Greenfield, J.
The City of New York brought this CPLR article 78 proceeding to challenge the determination by the Superintendent of Insurance of the State of New York which granted a premium increase of 18.9% to the Health Insurance Plan of Greater New York (HIP) for its health maintenance program.
HIP is a not-for-profit organization which provides prepaid medical services to its subscribers. The city pays the full premium for its employees to HIP.
HIP, claiming that it was facing a substantial erosion of its reserves because of the increase in costs, requested that the Superintendent approve a 21.5% increase in premiums for the fiscal year 1989-1990. (Each percentage point increase in the premium is said to cost the city approximately $2.2 million.)
A joint hearing by the Department of Insurance and the Department of Health was held on May 17, 1989. Thereafter, HIP and the city submitted additional materials and analysis in support of their respective positions regarding the disputed computations.
The Superintendent, after reviewing the testimony, documents and analysis allowed HIP an increase in its HIP/HMO nonmedical rate of 18.9% rather than the requested 21.5%. This decision was concurred in by the Department of Health.
The city had refused to pay any premium increase for 1989-1990, contending that the increase should be 13% at most. HIP insisted that unless the premiums as increased were paid, it would cut off coverage for all 300,000 municipal employees.
There is in dispute between the parties the appropriateness of $13 million in additional premiums. The city contends that beyond this further increase to HIP it will be responsible for the payment of another $27 million in premiums to other health care providers who are tied to the HIP/HMO rate. The HIP/HMO rate is also utilized in the Medicaid contract with the city’s Human Resources Administration (HRA).
The city maintains that the administrative decision approving the 18.9% increase issued by the Superintendent is arbitrary and capricious and contrary to law.
The Superintendent takes the position that based upon the hearing and data submitted by HIP, and after consideration of all factors including HIP’s financial condition and decline in reserves, the approved increase as reduced from the 21.5% *361 requested, will suffice to fund HIP’s needs, and that the record provides ample rational basis for a determination which is neither excessive nor discriminatory.
The Superintendent of Insurance is vested with authority to implement the various provisions of the Insurance Law (Matter of New York Pub. Interest Research Group v New York State Dept. of Ins., 66 NY2d 444; Matter of Ostrer v Schenck, 41 NY2d 782; Matter of Schwartz v Corcoran, 118 AD2d 355). Included in his powers and responsibilities is the rate-making function. (Insurance Law § 4308.) The determination of the Superintendent setting rates is to be upheld unless it lacks a rational basis (Matter of Medical Malpractice Ins. Assn. v Superintendent of Ins., 72 NY2d 753, cert denied 490 US 1080; Matter of American Tr. Ins. Co. v Corcoran, 105 AD2d 30, affd 65 NY2d 828) or is "without any reasonable support in the record”. (Matter of New York State Council of Retail Merchants v Public Serv. Commn., 45 NY2d 661, 672, citing Matter of Campo Corp. v Feinberg, 279 App Div 302, 307, affd 303 NY 995.)
Here the agency had ample information to make an informed judgment and reflecting an independent appraisal of the facts submitted, reached a determination independent of the positions espoused by both parties. Under such circumstances, no more can be asked.
The city has not demonstrated that the errors in computations which it claims are anything more than a dispute between their expert and HIP’s and the Superintendent’s. This being so, the matter falls squarely within the ambit of Medical Malpractice Ins. Assn. v Superintendent of Ins. (supra), and the court will not and may not disturb the Superintendent’s determination.
Moreover, the approval and payment by the city of the HRA contract with HIP at the 18.9% increased rate is a compelling admission that the rate set is reasonable. Upon scrutiny of the HRA contract and the adoption process, the city’s conduct is inconsistent with the position it espouses in this proceeding. Conduct of a party inconsistent with its claim at trial constitutes an admission (Williams v Glenny, 16 NY 389; Richardson, Evidence § 221 [Prince 10th ed]). Where the admission is not made in haste or inadvertently, it constitutes "high evidence” in favor of the provider that its rate was reasonable. (Prager v New Jersey Fid. & Plate Glass Ins. Co., 245 NY 1, 4.) Here, the conduct that forms the basis of the admission *362 involved HRA’s analysis of the HIP program and rate structure, and a comparison with other providers, which found HIP to be a substantially less expensive alternative. In addition, the contract was reviewed by counsel and twice submitted to the Board of Estimate for its approval. This process spanned many months and can hardly be viewed as precipitous or accidental.
The city’s contention that HRA contract was not an admission because at the time it was entered into the contract rate had not as yet been certified by the Superintendent begs the question. The rate proposed at that juncture was the originally sought 21.5% increase to which no objection or comment was raised in the entire HRA analysis. Further, as noted by HIP, it is precisely the rate the Superintendent approved, the 18.9% increase, which was finally adopted by the Board of Estimate. The contract as finalized with an 18.9% rate had no reservation of rights, neither did the Board of Estimate resolution approving it nor the payment tendered. None of these documents appears to contemplate this subsequently commenced court challenge to the rate set by the Superintendent.
The city’s next argument, that the term "cost-effective” used in the HRA transmittal recommendation to the Board of Estimate does not mean reasonable, is likewise misplaced. The city urges that "cost-effective” merely means the least expensive means of providing the service and that the criteria employed and the analysis undertaken reflect such limited definition, so that there has been no admission of reasonableness.
HIP, on the other hand, posits that "cost-effective” implicitly encompasses a concept of reasonable rates, and that the figures obtained on the comparative cost reviews indicate not merely a lower price for the HIP services, but a substantially lower one. Here the evidence submitted by the city indicates that the HIP service was not only cheaper, it produced significant savings for the city. The degree of savings produced in prior years was in excess of 30%. Such conclusions and analysis indicate that the HIP rates were not only less expensive but reasonable as well. If the differential between the possible methods of providing the service was small, then it might be unclear whether the HIP rate was reasonable; because then it might be only the best alternative of various high priced options. When there is so vast a disparity between the costs, the court is hard pressed not to find a significantly less expensive plan is not also one with a reasonable rate.
*363 The HRA contract is a government expenditure of public moneys for the purpose of providing medical care under welfare programs. The city’s position that reasonableness is not implicit in the term "cost-eifective” flies in the face of basic concepts of public trust and responsibility and is thoroughly unacceptable. The conclusion that HRA should continue its contract with HIP to provide services to those on public assistance considered numerous factors enumerated in the HRA’s guidelines, before it was concluded that the project was cost-effective. This is a reasonable and rational approach to placing such contracts. This analytic process, if followed, builds in reasonable rates.
This HRA program is jointly operated with State and Federal funding. The city’s partners in the enterprise would certainly question the conclusion that while the city’s agency, the HRA, considers the contract cost-effective, the city maintains it is unreasonable and nevertheless wants them to subsidize three quarters of this so-called over-priced venture. The city cannot be serious in advancing such a paradoxical position. The court prefers to find reason and rationality were a part of the analysis undertaken by HRA and the Board of Estimate, and that the city government was acting responsibly when it approved the HRA contract.
The city proffers the following explanations for the admission: (1) the HIP/HRA contract was one-tenth the size of the city employees’ contract; (2) that others were paying 75% of the cost of the HRA contract; and (3) if HIP was to be paid for services after June 30, 1989, the city had to act. None of these explanations are satisfactory or persuasive.
That the HRA contract was smaller does not affect the underlying reasonableness of the rates charged. Nor does it matter if others, namely the Federal and State governments will be providing 75% of the funding, for the city would still have to pay its share, at an inflated rate, albeit the sum would be smaller than the employee contracts. Given the city’s professed financial problems, this posture is pure double-talk. The rate is either objectively reasonable or it is not and it does not depend upon the size of the city’s exposure.
Lastly, the city’s claim that the Board of Estimate had to approve the contract before June 30, 1989 or HIP would not continue to be paid misses the point. The city wanted and needed a continuation of the services and agreed to pay for them without any reservations. The city also was required *364 under Insurance Law § 326 to abide by the Superintendent’s determination and pay the increased rates for its employees unless court intervention was sought. (Medical Malpractice Ins. Assn. v Methodist Hosp., 64 AD2d 558.) The city did not pay the increase or seek an immediate stay, yet HIP continued to provide the services to city employees under the collective bargaining agreements. The city, through its employees, received the benefits and ignored the law. The city is not exempt from the Insurance Law and it was required to abide by section 326. The failure to do so gives rise to a claim against the city under the equitable doctrine of "unclean hands.”
Obviously, the city could have sought a stay early on, and not waited until the eleventh hour to bring this proceeding. The city also could have approved the HRA contract subject to any court challenge on the rates, but it did not. Instead the city chose to wait, not paying the employee contract because it cost more out of pocket, but approving the HRA contract and foisting the bulk of the bill on the State and Federal governments. Such a procedure certainly had an adverse impact on the financial health of the provider HIP.
The contract adopted by the city for HRA is an admission that stands as "high evidence” of the reasonableness of the contested rate which remains undiluted by the explanations offered.
The admission, taken together with actuarial support for the rate, and the legitimate concerns for HIP’s continued viability, given its declining reserves and ratio of assets to liabilities, amply support the Superintendent’s finding. The rate increase fixed herein was comparable to, if not lower than for other HMO providers, which ranged from 6% to 40%. When coupled with HIP’s lower rate base, the increase in the lower end of the range still leaves HIP as one of the less costly providers. Under these circumstances, the rate increase authorized by the Superintendent was not arbitrary, excessive or discriminatory. No basis is demonstrated for interfering with the Superintendent’s rational and reasonable determination.
Accordingly, the application of the city is denied and the petition is dismissed. The interim order dated December 14, *365 1989, setting the rate to be paid to HIP pending the outcome of the proceedings is now vacated upon service of a copy of this judgment upon the city, and the increase authorized by the Superintendent shall go into effect.
[Portions of opinion omitted for purposes of publication.]